264 Kan. 363 (1998)
956 P.2d 685
CITIZENS' UTILITY RATEPAYER BOARD, Appellant,
v.
THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, Appellee.
MULTIMEDIA HYPERION TELECOMMUNICATIONS and KANSAS CITY FIBER NETWORK L.P., Appellants,
v.
THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, Appellee.
CMT PARTNERS, TOPEKA CELLULAR TELEPHONE COMPANY, INC., and AIRTOUCH CELLULAR OF KANSAS, INC., Appellants,
v.
THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, Appellee.
Nos. 78,548, 78,822, 78,823, 78,834.
Supreme Court of Kansas.
Opinion filed March 13, 1998.
*364 Walker Hendrix, consumer counsel, of Topeka, argued the cause, and Allen Brady Cantrell, consumer counsel, of Topeka, was with him on the briefs for appellant Citizens' Utility Ratepayer Board.
Mark P. Johnson, of Sonnenschein Nath & Rosenthal, of Kansas City, Missouri, argued the cause, and Tamara Seyler-James, Lisa C. Creighton, and Amy E. Bauman *365 of the same firm, were with him on the briefs for appellants Kansas City Fiber Network L.P. and Multimedia Hyperion Telecommunications.
Marc E. Elkins and Lisa J. Hansen, of Morrison & Hecker L.L.P., of Kansas City, Missouri, were on the briefs for appellants CMT Partners, Topeka Cellular Telephone Company, Inc., and Airtouch Cellular of Kansas, Inc.
Eva Powers, assistant general counsel, argued the cause, and Glenda Cafer, general counsel, and Marianne Deagle, Susan Stanley, and Janette Corazzin, assistant general counsels, of Topeka, were with her on the briefs for appellee Kansas Corporation Commission.
Robert A. Fox, of Foulston & Siefkin, L.L.P., of Topeka, argued the cause, and Dana Bradbury Green, of the same firm, and Michael J. Jewell, of Austin, Texas, were with him on the briefs for intervenor AT&T Communications of the Southwest, Inc.
William R. Drexel, of Topeka, argued the cause, and Michael C. Cavell and Lori A. Fink, of Topeka, and Frank A. Caro, of Polsinelli, White, Vardeman & Shalton, of Overland Park, were with him on the brief for intervenor Southwestern Bell Telephone Company.
Stephen D. Minns, of Overland Park, argued the cause, and Martha Jenkins, of Kansas City, Missouri, was with him on the briefs for intervenor United Telephone Companies of Kansas d/b/a Sprint Communications.
Mark E. Caplinger and James M. Caplinger, of James M. Caplinger, Chartered, of Topeka, and Thomas E. Gleason, Jr., of Gleason & Doty, Chartered, of Ottawa, were on the briefs for intervenors State Independent Alliance and Independent Telecommunications Group, Columbus, et al.
The opinion of the court was delivered by
ABBOTT, J.:
This case is before the Supreme Court on petitions for review by various parties and intervenors, viz., appellee Kansas Corporation Commission (KCC), intervenor Southwestern Bell Telephone, intervenor Sprint Communications/United Telephone Companies, intervenor State Independent Alliance, intervenor Independent Telecommunications Group, Columbus, et al., and appellants/cross-petitioners for review CMT Partners, et al.
SWBT and Sprint/United are incumbent local exchange carriers (LECs) in Kansas. State Independent Alliance and Independent Telecommunications Group, Columbus, et al., are special interest groups representing rural independent LECs (ILECs). The rural ILECs represented by these two groups provide local exchange services throughout Kansas. CMT Partners, et al., are business entities *366 and radio common carriers providing commercial mobile radio service in Kansas (wireless service providers). Multimedia Hyperion Telecommunications and Kansas City Fiber Network L.P. are providers of private line and competitive access services in Kansas.
In general, the Court of Appeals in 24 Kan. App.2d 222, 943 P.2d 494 (1997), invalidated certain portions of the Kansas Telecommunications Act of 1996 (Kansas Act) (L. 1996, ch. 268, ง 1 through ง 12, codified at K.S.A. 1996 Supp. 66-2001 et seq.) and the KCC orders implementing that Act on grounds they were inconsistent with the Federal Telecommunications Act of 1996 (Federal Act), Pub. L. No. 104-104, 110 Stat. 56 (1996), and also inconsistent with certain provisions of Kansas law. The Court of Appeals also held K.S.A. 66-1,143(b) does not prevent the KCC from requiring wireless service providers to contribute to the Kansas Universal Service Fund (KUSF); wireless service providers were not given proper notice of the proceedings and a reasonable opportunity to prepare for the hearings before the KCC; and the legislature's authorization to the KCC to determine the appropriate level of funding contribution and regulation of the KUSF pursuant to K.S.A. 1996 Supp. 66-2008 is not an unconstitutional delegation of legislative power to an administrative agency.
The KCC, SWBT, and Sprint are seeking to uphold the KCC orders and the provisions of the Kansas Act that the Court of Appeals found offensive. Citizens' Utility Ratepayer Board (CURB), Multimedia Hyperion/KCFN, and AT&T Communications of the Southwest, Inc., (AT&T) are seeking to have the provisions in question invalidated. CMT Partners, et al., also seek to invalidate these provisions. They believe they should not be required to contribute to the KUSF based on the fact that, as wireless service providers, they are not subject to KCC oversight and control. The real interest of State Independent Alliance and Independent Telecommunications Group, Columbus, et al., seems to be that, however this matter ends up, they do not want to lose any revenues in the process.
This court ordered a prehearing conference conducted by Chief Justice, Retired, David Prager. The only issues properly before this court for decision at the present time are the eight issues set out *367 in the prehearing conference order. Sections 253 and 254(e) of the Federal Act are not at issue, nor are KUSF distributions.
At the outset, we make three observations. First, although the underlying KCC regulations may ultimately increase competition, the underlying legislation appears to be largely a cost shift between consumers, with no actual reduction in the total cost of service. Second, the ultimate issues in this case will, for the most part, be determined by the federal courts under federal law, which will render most of this opinion as a suggestion to the federal courts for such consideration as they choose to give it, if any. Third, the appeal seems, in most part, to be premature. As we view the briefs, no actual harm is alleged, only potential or the possibility of harm. However, we do have jurisdiction and thus will decide the case.

BACKGROUND
By way of background, the KCC scheduled a Competition Docket in 1994. In Phase I of the KCC's Competition Docket, the KCC conducted hearings and established task forces regarding competition in the telecommunications industry in Kansas. Several telecommunications providers participated in Phase I, but appellant CMT, a wireless service provider, did not participate in any of these activities, nor did any other wireless service provider. On April 4, 1996, after the Federal Telecommunications Act was passed, the KCC issued its Phase II Procedural Order in the Competition Docket. On May 17, 1996, the Governor signed the Kansas Telecommunications Act. Within this Act, K.S.A. 1996 Supp. 66-2008(b) authorized the KCC to assess all telecommunications carriers, public utilities, and wireless service providers a surcharge for support of the KUSF.
Based on this statute, in May 1996, the KCC issued an order modifying the Phase II Procedural Schedule by including wireless issues. This order identified rate rebalancing, intrastate access rate reductions, and an assessment on toll minutes of use as issues to be addressed in the Phase II technical hearings, which were to be held August 12-15, 1996. This order also established a schedule for filing direct testimony on unresolved wireless issues. Finally, this order indicated that the KCC intended to exercise jurisdiction over *368 wireless service providers in regard to universal service. The affected parties had 70 days to retain experts and prepare direct testimony for the technical hearing and 45 days to review the KCC staff testimony and prepare cross-examination for the technical hearing. On June 17, 1996, the KCC also issued an order scheduling four public hearings on the issue of rate rebalancing.
The KCC served these orders on the telecommunications service providers who had participated in Phase I of the KCC's Competition Docket. Wireless service providers had not participated in Phase I and were not served orders notifying them of the Phase II hearings, even though the KCC considered exercising jurisdiction over wireless service providers in Phase II of the Competition Docket. The KCC directed all telecommunications companies, with notice of the hearings, to notify their customers of the hearings through a billing insert in the July 1996 billing cycle and through a newspaper advertisement in newspapers with general circulation in the counties where the telecommunications companies provided service. The KCC ordered the telecommunications companies to file affidavits of compliance with these notice requirements.
On August 12-15, 1996, the KCC conducted technical hearings pursuant to its April 4, 1996, Phase II Procedural Order. At the beginning of the hearings, CMT filed a petition to intervene in these proceedings, which the KCC granted. Upon intervention, CMT objected to the hearing, claiming that it had not received sufficient notice of the hearings. Due to this lack of notice, CMT claimed it had not had adequate time to prepare and file direct testimony or cross-examine witnesses who had already filed direct testimony. The KCC found that the notice of the proceeding was adequate and overruled CMT's objection.
Based on the facts presented at the Phase II technical hearings, the KCC issued an order on December 27, 1996, which provided for funding of the KUSF.
In general, the KCC final orders require: (1) intrastate toll and access rates for long distance service to be reduced by $111.6 million over 3 years with the objective of equalizing interstate and intrastate rates in a revenue neutral, specific, and predictable manner (i.e., toll and access charges paid by long distance companies *369 to LECs are to be reduced by that amount within that time frame); (2) the initial amount of the KUSF to offset revenues lost by local exchange carriers as a result of the reduction in intrastate toll and access long distance rates (i.e., the initial amount of the KUSF is to equal the amount of local exchange carriers' loss of revenue from reduced toll and access rates); (3) contributions to the KUSF to be based on each carrier's total intrastate retail revenues; (4) rates for pay phone calls to be increased to 350 and the free call allowances for directory assistance to be eliminated; and (5) wireless service providers to contribute to the KUSF.
CURB and various telecommunications providers appealed to the Court of Appeals from the KCC final orders, contending the Kansas Act and the KCC orders pursuant to that Act violated the Federal Act. The Court of Appeals stated that the key issue in this appeal is whether the Kansas Act and the KCC orders implementing that Act violate or are inconsistent with the Federal Act. The Court of Appeals held that the KCC orders do not comply with the Federal Act and must be set aside. The Court of Appeals also implicitly invalidated portions of the Kansas Act pertaining to the concept of revenue neutrality, K.S.A. 1996 Supp. 66-2005(c) and 66-2008(a), and prohibiting audits and earnings reviews, K.S.A. 1996 Supp. 66-2005(u), by directing the KCC to disregard those provisions upon remand.

THE FEDERAL ACT
The Federal Act became law on February 8, 1996. The Federal Act was intended to deregulate the telecommunications industry, open local and long distance telecommunications markets to competition, and ensure universal telephone service for all citizens at affordable rates.
Section 254(b) of the Federal Act provides in relevant part as follows:
"(b) UNIVERSAL SERVICE PRINCIPLES. The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles:
....

*370 "(4) EQUITABLE AND NONDISCRIMINATORY CONTRIBUTIONS. All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.
"(5) SPECIFIC AND PREDICTABLE SUPPORT MECHANISMS. There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service." 110 Stat. 71-72.
Section 254(f) of the Federal Act provides:
"(f) A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms." 110 Stat. 73.
Section 254(i) of the Federal Act provides:
"(i) CONSUMER PROTECTION. The Commission and the States should ensure that universal service is available at rates that are just, reasonable, and affordable." 110 Stat. 75.
Section 254(k) of the Federal Act provides:
"(k) SUBSIDY OF COMPETITIVE SERVICES PROHIBITED. A telecommunications carrier may not use services that are not competitive to subsidize services that are subject to competition. The Commission, with respect to interstate services, and the States, with respect to intrastate services, shall establish any necessary cost allocation rules, accounting safeguards, and guidelines to ensure that services included in the definition of universal service bear no more than a reasonable share of the joint and common costs of facilities used to provide those services." 110 Stat. 75.

THE KANSAS ACT
K.S.A. 1996 Supp. 66-2001 sets out the public policy underlying the Kansas Act.
K.S.A. 1996 Supp. 66-2002(h) requires the KCC, on or before January 1, 1997, to establish the KUSF pursuant to K.S.A. 1996 Supp. 66-2008 and to make various determinations relating to the implementation of the fund. The fund was established by the KCC's December 27, 1996, final orders.
*371 K.S.A. 1996 Supp. 66-2005(c) requires the reduction of intrastate access and toll charges for long distance service over a 3-year period with the objective of equalizing interstate and intrastate rates in a revenue neutral, specific, and predictable manner. In addition, that section provides that the KCC is authorized to rebalance local residential and business service rates to offset the intrastate access and toll charge reductions; further, any remaining portion of the reduction in access and toll charges not recovered through local residential and business service rates shall be paid out from the KUSF pursuant to K.S.A. 1996 Supp. 66-2008. Rural telephone companies are required to reduce their intrastate switched access rates to interstate levels on March 1, 1997, and every 2 years thereafter, as long as amounts equal to such reductions are recovered from the KUSF.
K.S.A. 1996 Supp. 66-2005(u) provides that "[n]o audit, earnings review or rate case shall be performed with reference to the initial prices filed" by local exchange carriers pursuant to 66-2005(b).
K.S.A. 1996 Supp. 66-2008(a) provides that the initial amount of the KUSF shall be comprised of local exchange carrier revenues lost as a result of rate rebalancing and such revenues shall be recovered on a revenue neutral basis.
K.S.A. 1996 Supp. 66-2008(b) provides that the KCC shall require every telecommunications carrier, telecommunications public utility, and wireless service provider that provides intrastate telecommunications services to contribute to the KUSF on an equitable and nondiscriminatory basis and that those contributors may collect from customers an amount equal to their contribution.

THE COURT OF APPEALS' OPINION
The Court of Appeals held:
1. K.S.A. 1996 Supp. 66-2008(b), which requires wireless service providers to contribute to the KUSF, does not impermissibly confer jurisdiction on the KCC over wireless service providers in contravention of K.S.A. 66-1,143(b), which prohibits regulation of radio common carriers by the KCC. Requiring wireless service providers to make an equitable contribution to the KUSF is distinguishable *372 from the regulation of wireless service providers by the KCC. 24 Kan. App.2d at 234-35.
2. (a) The concept of "revenue neutrality" as used in K.S.A. 1996 Supp. 66-2005(c) and 66-2008(a) is not unconstitutionally vague.
(b) The term "revenue neutral" has a recognized meaning; the words "equitable and nondiscriminatory" have an understandable meaning that gives adequate direction to the KCC. No unlawful delegation of legislative authority has been shown by the legislature's use of the terms "revenue neutral" and "equitable and nondiscriminatory" in K.S.A. 1996 Supp. 66-2008. 24 Kan. App.2d at 237.
3. The concept of revenue neutrality, K.S.A. 1996 Supp. 66-2008(a) and 66-2005(c), and the prohibition against audits and earnings review in K.S.A. 1996 Supp. 66-2005(u) are inconsistent with the Federal Act, specifically งง 254(b)(4), (b)(5), (f), and (i), and prevented the KCC from performing its regulatory responsibilities in general and ensuring compliance by carriers with ง 254(k) of the Federal Act. It is impossible for the KCC to determine an affordable rate for universal service without being able to perform an audit or earnings review of the incumbent LECs. The KCC order has created a $111.6 million fund that bears no rational relation to the concept of universal service and its cost. The record on appeal does not contain substantial competent evidence to support the KCC's actions regarding the KUSF, and the KCC orders were made without foundation in fact and are unreasonable, arbitrary, and capricious. The statutory prohibition against audits and the concept of revenue neutrality are clearly inconsistent with the obligation of the KCC to ensure just and reasonable rates and charges for the consumers of Kansas. 24 Kan. App.2d at 237-39.
4. Upon remand, the KCC must comply with the Federal Act in establishing local rates and funding of the KUSF. In this context, its order must be consistent with ง 254(f), (i), and (k). Compliance should result in contributions to the KUSF by individual entities on an "equitable and nondiscriminatory" basis, as required under K.S.A. 1996 Supp. 66-2008(b). Without a thorough analysis of cost information, the equitable and nondiscriminatory standard of *373 K.S.A. 1996 Supp 66-2008(b) cannot be shown to have been met. 24 Kan. App.2d at 239.
5. The absence of evidence before the KCC regarding whether wireless service providers should be treated differently than other providers was due to wireless service providers not being given proper notice of the proceedings or a reasonable opportunity to prepare for the hearings before the KCC. 24 Kan. App.2d at 240.
6. The KCC orders unduly burden the basic local service consumer with loop costs that are attributable to other services. Upon remand, the KCC should make reasonable efforts to ensure that a reasonable apportionment of the costs of the local loop is made. 24 Kan. App.2d at 240.
7. The KCC's final orders relating to the KUSF are set aside, and the matter is remanded to the KCC for further proceedings. The KCC's decision to allow an increase in pay phone and directory assistance rates must also be set aside since that decision was part and parcel of the KUSF funding decision. Upon remand, the KCC must disregard the concept of revenue neutrality and the prohibition against any audit or earnings review. 24 Kan. App.2d at 240-41.

ISSUES
At the prehearing conference, the parties agreed that the issues on appeal are as follows:
A. Whether the Kansas Act and the KCC orders implementing that Act violate or are inconsistent with the Federal Act because the concept of revenue neutrality required by the Kansas Act, K.S.A. 1996 Supp. 66-2005(c) and 66-2008(a), is inconsistent with and/or preempted by ง 254(b)(4), (b)(5), (f), (i), or (k) of the Federal Act.
B. Whether the Kansas Act and the KCC orders implementing that Act violate or are inconsistent with the Federal Act because the prohibition against audits and earnings review found in the Kansas Act, K.S.A. 1996 Supp. 66-2005(u), is inconsistent with and/ or preempted by ง 254(b)(4), (b)(5), (f), (i), or (k) of the Federal Act.
*374 C. Whether the concept of revenue neutrality and the prohibition against audits and earnings review prevent the KCC from performing its regulatory responsibilities in general, K.S.A. 66-1,187 et seq., and/or are inconsistent with other provisions of the Kansas Act, such as the public policy of Kansas expressed in K.S.A. 1996 Supp. 66-2001.
D. Whether CMT et al., wireless service providers, were given proper notice of the proceedings and a reasonable opportunity to prepare for the hearings before the KCC.
E. Notwithstanding the provisions of K.S.A. 1996 Supp. 66-2008(b), whether K.S.A. 66-1,143(b) prevents the KCC from requiring wireless service providers to contribute to the KUSF.
F. Whether the Court of Appeals' decision has an unforeseen, adverse effect on rural ILECs, in light of the mandated reductions in ILEC intrastate access rates effective March 1, 1997, such that the Court of Appeals' decision should be reversed.
G. Whether the legislature's authorization to the KCC to determine the appropriate level of funding contribution and regulation of the KUSF pursuant to K.S.A. 1996 Supp. 66-2008 is an unconstitutional delegation of legislative power to an administrative agency.
H. Whether the KCC orders are in conformity with the Kansas Act, (1) as the initial size of the KUSF fails to comply with the mandate of K.S.A. 1996 Supp. 66-2008 and (2) the KCC orders improperly exempt LECs from contributing to the KUSF in violation of K.S.A. 1996 Supp. 66-2008(b).
Pursuant to the Kansas Act, K.S.A. 1996 Supp. 66-2005(c), the KCC ordered LECs to reduce intrastate access and toll rates for long distance services to interstate levels over a 3-year period. ("[A]ll local exchange carriers shall reduce intrastate access charges to interstate levels.... Rates for intrastate switched access, and the imputed access portion of toll, shall be reduced over a three-year period for SWBT and United with the objective of equalizing interstate and intrastate rates in a revenue neutral ... manner.") This reduction would result in a loss of revenue to LECs. To make up for this lost revenue, LECs are allowed to recover revenue they *375 otherwise will have lost as a result of the ordered access and toll reductions.
In general, "revenue neutrality" refers to equalizing interstate and intrastate rates for long distance service while at the same time making up the lost revenues resulting from the ordered intrastate rate reductions through payouts from the KUSF, by an increase in pay telephone call rates, and by charges for all directory assistance calls. The idea is to equalize interstate and intrastate rates for long distance service by forcing intrastate rates down and then offset the resulting loss of LEC revenue by substituting from other sources an amount equal to the amount lost.
All companies providing intrastate telecommunications services are required to contribute to the KUSF on an equitable and nondiscriminatory basis. Any provider which contributes to the KUSF may collect from customers an amount equal to such provider's contributions. K.S.A. 1996 Supp. 66-2008(b).
At the heart of its decision, the Court of Appeals held that the concept of revenue neutrality, K.S.A. 1996 Supp. 66-2008(a) and 66-2005(c), and the prohibition against audits and earnings review, K.S.A. 1996 Supp. 66-2005(u), both of which underlay the KCC orders, are inconsistent with ง 254(b), (f), (i), and (k) of the Federal Act:
"(b) UNIVERSAL SERVICE PRINCIPLES. The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles:
....
(4) EQUITABLE AND NONDISCRIMINATORY CONTRIBUTIONS. All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.
(5) SPECIFIC AND PREDICTABLE SUPPORT MECHANISMS. There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.
....
"(f) STATE AUTHORITY. A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State.

*376 A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.
....
"(i) CONSUMER PROTECTION. The Commission and the States should ensure that universal service is available at rates that are just, reasonable, and affordable.
....
"(k) SUBSIDY OF COMPETITIVE SERVICES PROHIBITED. A telecommunications carrier may not use services that are not competitive to subsidize services that are subject to competition. The Commission, with respect to interstate services, and the States, with respect to intrastate services, shall establish any necessary cost allocation rules, accounting safeguards, and guidelines to ensure that services included in the definition of universal service bear no more than a reasonable share of the joint and common costs of facilities used to provide those services."
Because of the holding that the revenue neutral concept and the no audit provision of the Kansas Act are inconsistent with the Federal Act, the Court of Appeals determined the KCC orders, which implement and follow the revenue neutral concept and the no audit provision, are likewise inconsistent with the Federal Act and must be set aside. 24 Kan. App.2d at 240-41.
Further, according to the Court of Appeals, the concept of revenue neutrality and the prohibition against audits prevents the KCC from performing its regulatory responsibilities in general, and the concepts are inconsistent with the obligation of the KCC to ensure just and reasonable rates and charges for the consumers of Kansas. 24 Kan. App.2d at 240-41.
The Court of Appeals noted the purpose of the KUSF is to ensure that all Kansans have access to universal service at affordable rates but stated it is impossible for the KCC to determine an affordable rate for universal service without being able to perform an audit or earnings review of incumbent LECs. The Court of Appeals further noted the record on appeal does not disclose the cost of basic telephone service in Kansas or the cost to provide universal service. It stated the funding level of the KUSF was preordained by the legislature at $111.6 million (the amount equal to *377 the revenues lost from the intrastate access and toll reductions) but that this funding level bears no rational relation to the concept of universal service and its cost. It commented that the funding methodology protects incumbent LECs by shifting lost revenues from one corporate pocket to another while requiring all other providers and consumers to bear the financial burden of revenue neutral regulation. It faulted the funding methodology for the KUSF as precluding meaningful review of whether LECs are using services that are not competitive to subsidize services that are subject to competition. 24 Kan. App.2d at 238.
The Court of Appeals ordered that, upon remand, the KCC must comply with ง 254(f), (i), and (k) of the Federal Act in establishing local rates and in funding the KUSF. As to compliance of the KCC orders with the Kansas Act, the Court of Appeals concluded that most of the issues raised in this regard were rendered moot by its decision reversing the KCC orders. However, it indicated that upon remand the KCC must establish contributions to the KUSF by individual entities on an equitable and nondiscriminatory basis, as required by K.S.A. 1996 Supp. 66-2008(b), but said that this equitable and nondiscriminatory standard cannot be met without a thorough analysis of cost information by the KCC. 24 Kan. App. 2d at 239.
Finally, the Court of Appeals held the KCC orders concerning the methodology to be used to determine payouts from the KUSF to LECs is inconsistent with ง 254(k) of the Federal Act, which directs that the states should establish any necessary cost allocation rules, accounting safeguards, and guidelines to ensure that services included in the definition of universal service bear no more than a reasonable share of the joint and common costs of facilities used to provide those services. In this regard, the Court of Appeals stated that the KCC orders unduly burden the basic local service consumer with loop costs that are attributable to other services because the amount of support to be paid LECs from the KUSF is based upon allocating 100% of the loop costs to basic local service but actually only about 75% of the cost of basic residential service is the cost of the local loop. 24 Kan. App.2d at 240.
*378 The Court of Appeals then invalidated the KCC final orders and remanded for further proceedings, with directions to the KCC to disregard the concept of revenue neutrality and the no audit or earnings review provision of the Kansas Act as they are inconsistent with the Federal Act and the public policy of Kansas as expressed in K.S.A. 1996 Supp. 66-2001. It also set aside the KCC's decision to allow an increase in pay phone and directory assistance rates on grounds that decision was part and parcel of the KUSF funding decision which the court invalidated. 24 Kan. App.2d at 240-41.
With regard to the first three issues on appeal, the Court of Appeals determined the revenue neutral and no audit provisions of the Kansas Act (1) are inconsistent with ง 254(b)(4), (b)(5), (f), and (i) of the Federal Act; (2) prevent the KCC from ensuring compliance with ง 254(k) of the Federal Act, i.e., from ensuring that carriers do not use services that are not competitive to subsidize services that are subject to competition; (3) prevent the KCC from performing its regulatory responsibilities in general and ensuring just and reasonable rates and charges for the consumers of Kansas; and (4) make it impossible for the KCC to determine an affordable rate for universal service. The Court of Appeals found fault with the KCC orders apparently because (1) they are based on and follow the revenue neutral and no audit provisions of the Kansas Act; (2) due to the requirement of revenue neutrality, the funding level of the KUSF established by the orders has no rational relation to the concept of universal service and its cost; (3) the funding methodology for the KUSF precludes meaningful review of whether LECs are using services that are not competitive to subsidize services that are subject to competition; (4) the funding methodology possibly might not result in contributions on an equitable and nondiscriminatory basis; (5) the orders are not based on a thorough analysis of cost information which makes it impossible to determine whether contributions to the KUSF are on an equitable and nondiscriminatory basis; and (6) the payout methodology is inconsistent with ง 254(k) of the Federal Act.

A. REVENUE NEUTRALITY
K.S.A. 1996 Supp. 66-2005(c) provides:

*379 "(c) Subject to the commission's approval, all local exchange carriers shall reduce intrastate access charges to interstate levels as provided herein. Rates for intrastate switched access, and the imputed access portion of toll, shall be reduced over a three-year period with the objective of equalizing interstate and intrastate rates in a revenue neutral, specific and predictable manner. The commission is authorized to rebalance local residential and business service rates to offset the intrastate access and toll charge reductions. Any remaining portion of the reduction in access and toll charges not recovered through local residential and business service rates shall be paid out from the KUSF pursuant to K.S.A. 1996 Supp. 66-2008. Rural telephone companies shall reduce their intrastate switched access rates to interstate levels on March 1, 1997, and every two years thereafter, as long as amounts equal to such reductions are recovered from the KUSF."
K.S.A. 1996 Supp. 66-2008 provides in relevant part:
"On or before January 1, 1997, the commission shall establish the Kansas universal service fund, hereinafter referred to as the KUSF.
"(a) The initial amount of the KUSF shall be comprised of local exchange carrier revenues lost as a result of rate rebalancing pursuant to subsection (c) of K.S.A. 1996 Supp. 66-2005 and subsection (a) of K.S.A. 1996 Supp. 66-2007. Such revenues shall be recovered on a revenue neutral basis. The revenue neutral calculation shall be based on the volumes and revenues for the 12 months prior to September 30, 1996, adjusted for any rate changes."
K.S.A. 1996 Supp. 66-2015 provides:
"The commission shall not enforce any provision of this act nor any order entered by authority of this act which is specifically preempted by the federal act."
As noted previously, "revenue neutral "refers to the replacement of revenues lost to LECs by the ordered reductions in intrastate rates by payments from the KUSF, by an increase in pay telephone rates, and by the elimination of free directory assistance calls.
In relevant part, the Court of Appeals stated:
"The revenue neutral concept is foreign to the Federal Act and was obviously intended by the Kansas Legislature to protect revenues by incumbent LECs facing a $111.6 million loss of earnings as a result of reductions in long distance rates and toll charges.... This legislation is inconsistent with the provisions of the Federal Act, specifically งง 254(b)(4), (b)(5), (f), and (i), and prevented the KCC from performing its regulatory responsibilities in general and insuring compliance by carriers with ง 254(k) of the Federal Act.
....
"....The funding level of $111.6 million for the KUSF was preordained by the Kansas Legislature once the concept of revenue neutrality and the prohibition against investigation of profits was written into the Kansas Act.... This made *380 inevitable the KCC decision to set the funding level of the KUSF in an amount equal to the intrastate access and toll reductions.
"The result is a final order that fully protects incumbent LECs by shifting lost revenues from one corporate pocket to another while requiring all other providers and consumers to bear the financial burden of "revenue neutral" regulation.... Finally, the KCC order has created a $111.6 million fund that bears no rational relation to the concept of universal service and its cost.
....
" [T]he concept of revenue neutrality [is] clearly inconsistent with the obligation of the KCC to ensure just and reasonable rates and charges for the consumers of Kansas.
....
"CMT and KCFN maintain that KUSF contributions under the KCC orders are not made on an equitable and nondiscriminatory basis. In part, their argument is that the revenue neutral requirement of the Kansas Act gives the LECs an unfair competitive advantage.... We have no doubt that the KCC, upon remand, will give these issues careful consideration.
"CMT has also asserted that the KCC orders have a discriminatory impact against wireless companies ... and that it is anti-competitive to force them to subsidize the incumbent LECs....
....
"Upon remand, the KCC must disregard the concept of revenue neutrality... as it is wholly inconsistent with the Federal Act and the public policy of Kansas as expressed in K.S.A. 1996 Supp. 66-2001." 24 Kan. App.2d at 237-41.
In its petition for review, the KCC argued that the Federal Act does not preclude revenue neutrality for local exchange companies when making implicit support explicit; the revenue neutral phase-down of access charges represents a transition to a cost-based universal service fund; if the KUSF had been called something else, such as the Transition Fund, no section of the Federal Act would have been applicable to the revenue neutral phase-down; the KCC, with regard to the KUSF, is more or less following the path of the FCC, with regard to the Federal Universal Service Fund (FUSF); an abrupt transition to cost-based rates could be highly disruptive to the industry and have an unfavorable impact on customers; the Kansas Act's provision for initial revenue neutral recovery, when access charges are reduced, and the KCC orders to that effect, minimize the likelihood of such a disruption; the Kansas Legislature, not the Court of Appeals, has the authority to determine how best to implement the federal mandate to make *381 implicit subsidies explicit; and the legislature has determined that revenue neutrality is required in the first instance during a transition phase.
In their joint petition for review, SLA and Independent Telecommunications Group complain, among other things, that the Court of Appeals incorrectly commingled the concept of revenue neutrality with the no audit or earnings review provision.
In its petition for review, SWBT argued that, at the federal level, the FCC has taken actions implementing price cap regulation and universal service that mirror the requirements of the Kansas Act and, over a decade ago, the FCC restructured interstate access charges in a revenue neutral manner. SWBT concludes from this that the revenue neutral provisions of the Kansas Act are clearly consistent with federal policies.
Sprint addressed the issue in its petition for review by arguing that revenue neutrality is transitional and that because "the KCC's decision to establish an initial transitional KUSF, based on current funding requirements subject to future modification, is similar to the FCC's Universal Service Report and Order, it is obvious that the KCC's Order is consistent with the Federal Act." Sprint further argues, among other things, that "nowhere in the Federal Act does it state that revenue-neutral plans are prohibited."
In its response to the KCC petition for review, Multimedia Hyperion, KCFN, and CMT Partners argued that (1) revenue neutrality was not transitional but a permanent feature of the KUSF; (2) even if it were transitional, the Federal Act contains no exemption for transitional programs; (3) the FCC's means of implementing a federal universal service fund is irrelevant; and (4) revenue neutrality is a means to protect LEC revenue, not a means to ensure affordable telecommunications services for Kansas residents.
The KCC takes the position that (1) the FCC, not the courts, has jurisdiction over the matter of barriers to entry; (2) revenue neutrality is a necessary first step in removing implicit support payments; and (3) "[T]he KCC is statutorily required to `periodically review the KUSF to determine if the costs of qualified telecommunications public utilities... to provide local service justify modification of the KUSF.' K.S.A. [1996 Supp.] 66-2008(d). Thus, *382 although the KCC was required to assure the local exchange companies revenue neutrality when they reduced their access charges, in the long term the KCC is required to review the cost of providing local service and modify the KUSF accordingly."
SWBT argues that revenue neutrality as well as the KUSF is subject to eventual change.
The parties have filed a multitude of other supplemental briefs. We have examined the record and studied the briefs. The legislature determines utility policy, and so long as a legislative act does not contravene federal or state law, courts should not interfere with it, even though the action taken appears, to the court, to be unsound and not the best way, or even a good way, to carry out the stated purpose of the act.
Prior to the revenue neutrality concept, the KCC had procedures in place to give the telecommunications industry an opportunity to make a profit. A large part of the revenue came from access charges and long distance rates. The legislature heeded the concern that lost revenue from reduced access charges needed to somehow be replaced by the Act.
Supposedly, the consumers were paying a fair total price for services prior to the Kansas Act. The legislature based the Act, which replaced the lost revenues, on that premise. That premise, when placed under close scrutiny, does not, and cannot, always show that each part of the cost-shifting act is a fair change. However, a constant arranging and rearranging of additional costs goes on between the regulatory agency and the public utilityโalways with the purpose of arriving at a fair total price. Here, the legislature sets up a procedure to insure that the utilities would have the same revenue under the new Act as they had prior to the Act. We hold the revenue neutral concept is not prohibited by or contrary to the Federal Act. When Kansas passed the Act in question, there were no federal regulations in place. We do not have before us the federal regulations concerning the Federal Act.

B. AUDIT AND EARNINGS REVIEW
K.S.A. 1996 Supp. 66-2005(u) provides:

*383 "(u) No audit, earnings review or rate case shall be performed with reference to the initial prices filed as required herein."
"As required herein" apparently refers only to prices filed pursuant to K.S.A. 1996 Supp. 66-2005(b) by companies that have elected price cap regulation. Apparently, no company had made such an election when this appeal was filed.
In relevant part, the Court of Appeals stated:
"[I]n any event, there was to be no audit, earnings review, or rate case with reference to an LEC's initial prices filed pursuant to K.S.A. 1996 Supp. 66-2005(b)....
"... It is impossible for the KCC to determine an affordable rate for universal service without being able to perform an audit or earnings review of the incumbent LECs....
"What is the cost of basic telephone service in Kansas? We have no answer from the record before us. What is the cost to provide universal service? We have no answer from the record before us. The funding level of $111.6 million for the KUSF was preordained by the Kansas Legislature once the concept of revenue neutrality and the prohibition against investigation of profits was written into the Kansas Act....
".... Finally, the KCC order has created a $111.6 million fund that bears no rational relation to the concept of universal service and its cost.
"... Likewise, the KCC must disregard the provision of K.S.A. 1996 Supp. 66-2005(u) that prohibits any audit or earning[s] review. The KCC cannot meet its general regulatory responsibilities or those mandated under the Federal Act without a complete and thorough review of the earnings of the LECs." 24 Kan. App.2d at 237-41.
There is no indication that the Court of Appeals was basing its decision on a belief or understanding that the no audit or earnings provision applied only to prices filed by companies that had elected price cap regulation and that no company had made such an election at the time this appeal was filed.
In its order on reconsideration, the KCC stated that it would need to reevaluate the KUSF for consistency with the FCC universal service order guidelines once the FCC order was issued. In its brief filed on June 3, 1997, and in its May 28, 1997, motion for clarification, the KCC acknowledges that the May 8, 1997, FCC order requires that universal service orders be based on cost studies. The FCC order finds that the states are responsible for identifying *384 existing implicit universal service subsidies and emphasizes that the revenues of the carriers must be carefully examined. The KCC has said that it will comply with the FCC order by performing and implementing cost studies in connection with the KUSF.
The KCC was caught in a "catch 22" situation. This case started and the record was made without federal regulations defining the Federal Act. Federal regulations have since been adopted. The Court of Appeals appears to have obtained copies, although they were not available and thus not considered by the KCC when it issued its order. While this appeal was pending, the KCC would be reluctant to, if not prevented from, adopting different rules, regulations, and rates.
As we read the Kansas Act, it does not prevent the KCC from making appropriate adjustments and performing a cost study or from conducting an audit or earnings review at this time. As we view what the legislature did, it assumed the rates that existed when the Act in question was adopted, were not unreasonable, arbitrary, and capricious, i.e., in compliance with Kansas law. The legislature started with this premise. The legislature had to start with a figure in mind, and the fact that it chose a different method of obtaining a starting figure than what the court might have done, does not require us to hold that it violates K.S.A. 77-621. We hold that the legislature has the authority to start from this premise and the Act, insofar as this issue is concerned, is valid.

C. KCC REGULATORY RESPONSIBILITIES
The Court of Appeals held that the concept of revenue neutrality and the prohibition against audits and earnings review prevent the KCC from performing its regulatory responsibilities in general, K.S.A. 66-1,187 et seq., and are inconsistent with the obligation of the KCC to ensure just and reasonable rates and charges for the consumers of Kansas. The Court of Appeals further held the revenue neutrality and no audit provisions were wholly inconsistent with the public policy of Kansas as expressed in K.S.A. 1996 Supp. 66-2001.
Apparently, the holding was based on its determination that (1) the revenue neutral provision kept the KCC from determining the *385 appropriate funding level for the KUSF; (2) the no audit or earnings review provision made it impossible for the KCC to determine an affordable rate for universal service; and (3) both provisions would have made inadequate any regulatory review to determine the propriety of local telephone rate changes.
CURB was the party who initially raised this issue before the Court of Appeals, and it focused only on the no audit or earnings review provision. CURB argued that the no audit or earnings review provision precluded the KCC from performing an audit, earnings review, or rate case in order to establish the initial prices to be used as price caps in the price baskets but that these initial prices
"can never be changed by the KCC because in the future the price caps (initial prices) will automatically increase without a KCC determination. This occurs in conjunction with the formula created in the KCC's Order of December 27th. Because K.S.A. ง 66-1,187 et seq. were not repealed as part of the enactment of [the] Kansas Act, the new mandates are inconsistent and do not allow the KCC to fulfill its statutory duty to ensure just, reasonable and affordable rates....
"....The KCC can not reconcile its duty to produce just and reasonable rates with its inability to require an audit or examine costs. Reading the provisions of the federal and state acts together shows that the KCC must be allowed to use any methods necessary to ensure rates that [are] just and reasonable and not merely accept rates as presented to them by utilities. K.S.A. 1996 Supp. 66-2005(u) is not harmonious with the other sections of the Kansas Act and existing federal and state law and should not be read as a limit on the power of the KCC to fulfill its statutory duty."
The sections in the Act which provide for revenue neutrality and no audit or earnings review are transitional. For the reasons set forth in sections A and B of this opinion, we hold that the Kansas Act does not conflict with the KCC's statutory duty to regulate and ensure just and reasonable rates and charges to consumers.

D. PROPER NOTICE
On appeal, CMT Partners, et al. challenges the 14.1% KUSF surcharge, applicable to wireless service providers, as a violation of due process because they were not provided with proper notice of the Phase II technical hearings when the surcharge was discussed. According to CMT, the KCC knew CMT had not previously been *386 involved in Phase I of the Competition Docket. Further, the KCC knew it had never attempted to exercise jurisdiction over CMT before, so CMT would not suspect the Competition Docket might somehow apply to it. Nevertheless, CMT asserts, the KCC made no attempt to timely notify any wireless service provider of the Phase II technical hearings, including CMT, even though the KCC was proposing a surcharge on the intrastate revenues of wireless service providers at the hearing. As a result of the hearing, the KCC imposed a 14.1% KUSF surcharge on all wireless service providers in Kansas. According to CMT, this surcharge has resulted in a violation of due process pursuant to the 14th Amendment to the United States Constitution and งง 2 and 18 of the Kansas Constitution Bill of Rights.
After the KCC filed its order, based in part on the Phase II technical hearings, CMT filed two petitions for KCC reconsideration. In both petitions for reconsideration, CMT alleged that the technical hearings should be reopened because it was not given the opportunity to fully and fairly participate in the hearings. However, neither petition for reconsideration addressed what new facts CMT might introduce at the rehearing to prove that the KUSF surcharge is excessive as to wireless service providers. Since CMT did not raise any new facts in its petitions for KCC reconsideration that it would have argued at the technical hearings, had it been given proper notice, we hold that CMT has waived its right to reopen the technical hearings and argue new facts, despite the fact that CMT may not have received proper notice prior to the Phase II technical hearings. As such, there is no need to reopen the technical hearings. KCC's orders as to CMT, and other wireless service providers, including the 14.1% KUSF surcharge, stand.

E.K.S.A. 66-1,143(b)
K.S.A. 66-1,143 provides:
"(a) As used in this section and K.S.A. 66-1,145 and amendments thereto, `radio common carrier' shall include all persons and associations of persons, whether incorporated or not, operating a public `for hire' radio service engaged in the business of providing a service of radio communication, including cellular radio, which is one-way, two-way or multiple, between mobile and base stations, between *387 mobile and land stations, including land line telephones, between mobile stations or between land stations, but not engaged in the business of providing a public land line message telephone service or a public message telegraph service within this state.
"(b) Except as provided in this subsection and K.S.A. 66-1,145 and amendments thereto, no radio common carrier shall be subject to the jurisdiction, regulation, supervision and control of the state corporation commission. The state corporation commission shall have the power and authority granted by K.S.A. 66-1,145 and amendments thereto and the power and authority to regulate and control radio common carriers whenever it is necessary to protect the public interest against cross-subsidization of competitive goods or services by monopoly goods and services." (Emphasis added.)
K.S.A. 66-1,145 provides:
"Except as otherwise provided in this section, each radio common carrier may interconnect its common carrier radio telephone facilities with the telephone facilities of the telephone public utility certificated to serve the exchange area in which the base station of the radio common carrier is located if an agreement can be reached between the radio common carrier and the telephone public utility providing for such interconnection. When such an agreement cannot be reached between the radio common carrier and the telephone public utility, the radio common carrier may petition the state corporation commission for the right of interconnection and if the commission finds that a necessity exists therefor such interconnection shall be ordered by the commission on such reasonable terms as shall be established and prescribed by the commission."
As a part of the Kansas Act, the legislature promulgated K.S.A. 1996 Supp. 66-2008, which provides in pertinent part:
"On or before January 1, 1997, the commission shall establish the Kansas universal service fund, hereinafter referred to as the KUSF.
....
"(b) The commission shall require every telecommunications carrier, telecommunications public utility and wireless telecommunications service provider that provides intrastate telecommunications services to contribute to the KUSF on an equitable and nondiscriminatory basis. Any telecommunications carrier, telecommunications public utility or wireless telecommunications service provider which contributes to the KUSF may collect from customers an amount equal to such carrier's, utility's or provider's contribution." (Emphasis added.)
CMT argues K.S.A. 66-1,143(b) applies to it and absolutely prohibits the KCC from exercising any jurisdiction over it as a radio common carrier. Then, CMT asserts that 66-2008(b), and its required KUSF assessment, is an exercise of jurisdiction over it as a *388 radio common carrier. As such, CMT asserts that 66-2008(b) and its application to it and all other radio common carriers conflicts with K.S.A. 66-1,143(b) and should be struck down. The failure of CMT to raise this issue in the administrative proceedings does not preclude this court from deciding the issue on appeal.
CMT alleges that K.S.A. 66-1,143(a), as it applies to it, prohibits the KCC from exercising jurisdiction over it as a radio common carrier. In making this argument, CMT acknowledges that the statute's prohibition from exercising any jurisdiction over radio common carriers contains two exceptions. First, the KCC may exercise jurisdiction over radio common carriers in order to adjudicate disputes concerning interconnection agreements between radio common carriers and telephone public utilities. K.S.A. 66-1,145. Second, the KCC may exercise jurisdiction over radio common carriers if it is necessary to protect the public interest against cross-subsidization of competitive goods and services by monopoly goods and services. K.S.A. 66-1,143(b).
K.S.A. 1996 Supp. 66-2008(b) allows the KCC to require wireless telecommunications service providers, such as CMT, to contribute to the KUSF on an equitable and nondiscriminatory basis. Relying on this statute, the KCC adopted orders which required wireless service providers to pay a surcharge to the KUSF. CMT argues that such a requirement is an exercise of jurisdiction over it by the KCC. Further, CMT asserts that this exercise of jurisdiction does not fall within either of the exceptions delineated in 66-1,143 and 66-1,145. As such, CMT asserts that 66-2008(b) allows the KCC to do that which is prohibited by K.S.A. 66-1,143(b)โexercise jurisdiction over wireless service providers/ radio common carriers without meeting the two exceptions set out in 66-1,143 and 66-1,145. As CMT points out, the Kansas Act, including 66-2008, does not purport to create a third exception to K.S.A. 66-1,143(b). Without such an exception, CMT argues that the KCC is statutorily prohibited, under 66-1,143(b), from exercising any jurisdiction over CMT, including assessing a surcharge to finance the KUSF under 66-2008(b). Thus, CMT asks this court to set aside 66-2008(b) and the KCC's orders implementing 66-2008(b) *389 as they apply to CMT and other wireless service providers/ radio common carriers.
Courts must "construe all provisions of statutes in pari materia with a view of reconciling and bringing them into workable harmony, if reasonably possible to do so." Kansas-Nebraska Natural Gas Co. v. State Corporation Commission, 176 Kan. 561, Syl. ถ 1, 271 P.2d 1091 (1954). Under this rule of statutory construction, the KCC argues that the two statutes, 66-1,143(b) and 66-2008(b), can be read in harmony.
47 U.S.C. ง 332(c)(3) (1994) (Omnibus Budget Reconciliation Act of 1993) provides:
"STATE PREEMPTION.
(A) Notwithstanding sections 152(b) and 221(b) of this title, no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services. Nothing in subparagraph shall exempt providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such State) from requirements imposed by a State commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications service at affordable rates." (Emphasis added.)
Section 332(c)(3) prohibits states from regulating the rates of commercial mobile service providers, just as K.S.A. 66-1,143(b) prohibits the KCC from regulating radio common carriers. GTE Mobilnet of Ohio v. Johnson, 111 F.3d 469 (6th Cir. 1997).
Further, compare 66-2008(b) and its requirement to assess wireless service providers a surcharge to support the KUSF to ง 254(f) of the Federal Act, which provides:
"(f) STATE AUTHORITY. A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State. A state may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms." (Emphasis added.) 110 Stat. 73.
*390 The FCC recently evaluated the interaction between these two federal statutes when a party claimed that the statutes were inconsistentโallowing states to assess wireless service providers with a surcharge (ง 332[c][3]) but also prohibiting the state from regulating such wireless service providers (ง 254[f]). In addressing this issue, the FCC concluded that the two statutes were not in conflict and that ง 332 and its prohibition on rate regulation of wireless service providers does not prohibit a state from assessing wireless service providers a surcharge to support universal service under ง 254(f). In so holding, the FCC stated:
"777. We agree with the Joint Board's recommendation that all telecommunications carriers that provide interstate telecommunications services must contribute to the support mechanism....
....
"791. With respect to the issue of whether states may require CMRS providers to contribute to state universal service support mechanism, we agree with the Joint Board and find the section 332(c)(3) does not preclude states from requiring CMRS providers to contribute to state support mechanisms. Section 254(f) states that states may require telecommunications carriers that provide intrastate telecommunications services to make equitable and nondiscriminatory contributions to state support mechanisms. Section 332(c)(3) prohibits states from regulating the rates charged by CMRS providers. Section 332(c)(3) also states that `[n]othing in this subparagraph shall exempt providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such [s]tate)' from state universal service requirements. Several [commentators] argue that section 332(c)(3) prohibits states from requiring CMRS providers operating within a state to contribute to state universal service programs unless the CMRS provider's service is a substitute for land line service in a substantial portion of the state. The Joint Board, however, disagreed. California PUC has adopted this interpretation and has required CMRS providers in California to contribute to the state's programs for Lifeline and high cost small companies since January 1, 1995. A Connecticut state court, however, has ruled that section 332(c)(3) prohibits Connecticut from assessing contributions against CMRS providers for intrastate universal service programs." (Emphasis added.) In the Matter of Federal-State Joint Board on Universal Service, FCC Docket 97-157, Order May 8, 1997.
The United States District Court for the District of Kansas agreed with the FCC's ruling on this issue regarding whether the two federal statutes conflict. Further, the federal court held that 66-2008(b), adopted pursuant to ง 254(f), was consistent with and *391 not preempted by 47 U.S.C. ง 332(c)(3)(A). In so holding, the federal court stated:
"The court finds that 47 U.S.C. งง 254(f) and 332(c)(3)(A) exist in harmony and do not conflict with each other. K.S.A. 66-2008(b), adopted in conformity with 47 U.S.C. ง 254(f), must be construed, therefore, as consistent with federal law. Accordingly, the court concludes that the KCC order requiring all commercial mobile service providers in the state to contribute to the KUSF is not preempted by federal law." Mountain Solutions v. State Corp. Com'n of KS, 966 F. Supp. 1043, 1049 (D. Kan. 1997).
In order to determine if K.S.A. 66-1,143(b) and 66-2008(b) conflict, it is first necessary to determine exactly what each statute provides. All the parties seem to agree on the general interpretation of 66-2008(b). It allows the KCC to assess a surcharge from CMT, as a wireless service provider, in order to support the KUSF. However, the parties disagree on the interpretation of K.S.A. 66-1,143(b). CMT asserts that K.S.A. 66-1,143(b) prohibits the KCC from exercising any jurisdiction, regulation, supervision, or control over radio common carriers, except for the exceptions specifically enumerated in 66-1,143(b) and 66-1,145. On the other hand, the KCC and SWBT seem to interpret 66-1,143(b) in a more narrow fashion, as 47 U.S.C. ง 332(c) has been interpretedโprohibiting only the KCC's regulation of a radio common carrier's rates or market entry.
"In interpreting a statute, [a court] must give effect to its plain and unambiguous language, without determining what ... the law should be." State v. Reed, 23 Kan. App.2d 661, 663, 934 P.2d 157, rev. denied 262 Kan. 968 (1997). "When a statute is plain and unambiguous, the appellate courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in the statute. [Citation omitted.]" State v. Lawson, 261 Kan. 964, 966, 933 P.2d 684 (1997). "`"In construing statutes, the legislative intention is to be determined from a general consideration of the entire act. Effect must be given, if possible, to the entire act and every part thereof. To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible."` [Citation omitted.]" KPERS v. Reimer & Koger Assocs., *392 Inc., 262 Kan. 635, 643-44, 941 P.2d 1321 (1997). "`"In order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act, but are required to consider and construe together all parts thereof in pari materia....."' [Citation omitted.]" 262 Kan. at 644. "[S]everal provisions of an act, in pari materia, must be construed together with a view of reconciling and bringing them into workable harmony and giving effect to the entire act if it is reasonably possible to do so. [Citation omitted.]" State v. Le, 260 Kan. 845, 847-48, 926 P.2d 638 (1996).
From a straightforward reading of K.S.A. 66-1,145(b), it prohibits the KCC from exercising any jurisdiction, regulation, supervision, or control over radio common carriers. K.S.A. 66-1,143(b) does not merely prohibit the regulation of rates or market entry over radio common carriers, as 47 U.S.C. ง 332(c) does. K.S.A. 66-1,143(b) imposes a broader prohibition on the KCC's regulation of radio common carriers than 47 U.S.C. ง 332(c) imposes on a state's regulation of radio common carriers. In comparing the language of the two statutes, K.S.A. 66-1,143(b) uses much broader language than 47 U.S.C. ง 332(c) and should be interpreted as such.
However, K.S.A. 66-1,143(b) does not define exactly what an exercise of jurisdiction, regulation, supervision, or control over a radio common carrier by the KCC is. The meaning of these terms is ambiguous and defining the terms requires judicial interpretation, taking into account the court's duty to reconcile all parts of the statute. Black's Law Dictionary (6th ed. 1990) defines some of these terms. "Jurisdiction" is defined as "power and authority of a court to hear and determine a judicial proceeding." p. 853. "Regulation" is defined as a "rule or order prescribed for management or government." p. 1286. "Supervise" is defined as "to inspect" or "to have general oversight over." p. 1438. "Control" is defined as "[p]ower or authority to manage, direct, superintend, restrict, regulate, govern, administer, or oversee." p. 329.
Determining precisely how these terms should be interpreted within K.S.A. 66-1,143(b) is not necessary. The more relevant question is whether a KUSF assessment by the KCC might fall within the general definition of the terms. The federal court found *393 such an assessment by a state, authorized under ง 254, was not a "rate regulation." However, the federal court did not determine whether the assessment qualified as a general exercise of jurisdiction or control, as opposed to a specific regulation of rates. The court simply referred to the assessment as an "additional cost of doing business." This definition of a KUSF assessment does not match the definitions of any of the KCC acts prohibited by K.S.A. 66-1,143. See Mountain Solutions, 966 F. Supp. at 1048 ("The mandatory KUSF contributions that the KCC has imposed on all telecommunications providers in the state do not constitute a regulation of rates or market entry. The assessments simply constitute an additional cost of doing business that the companies either may absorb themselves or pass on to their customers.").
The KCC has historically exercised jurisdiction over the access rates imposed by LECs on wireless service providers for interconnecting with the wire line network. The KCC's prior regulation of access rates charged to CMT did not violate 66-1,143 and its prohibition against regulation of CMT. Thus, this regulation of access rates charged to CMT, through the KUSF contribution required under 66-2008(b), does not violate K.S.A. 66-1,143, either.
In other words, 66-2008(b), together with 66-2005(c), simply manipulates the manner in which costs, traditionally paid through access rates and used to support the wire line infrastructure, are paid to local exchange carriers. The cost of supporting the wire line infrastructure is not a new one; it is simply paid by a different method under 66-2008(b). Such cost used to be paid directly to the local exchange carriers by wireless and other telecommunications providers through high access rates. Now, access rates have been mandatorily reduced, and the expense of supporting the wire line infrastructure is paid to the KUSF through an assessment on the intrastate revenues of wireless and other telecommunication providers. This fulfills the Kansas Legislature's purpose of making an implicit subsidy explicit.
The KCC previously set the access rates which local exchange carriers could charge to CMT without violating K.S.A. 66-1,143(b) and its prohibition against regulation over CMT. Now, under 66-2005(c), the KCC has lowered the set access rates which local *394 exchange carriers may charge CMT. In order to pay for the upkeep on the wire line infrastructure, which higher access rates used to pay for, the KCC, under 66-2008(b), has assessed a KUSF surcharge on CMT and other telecommunication providers. This surcharge will be paid out to LECs, to replace the lost revenues due to the reduced access rates, so the LECs can support the wire line infrastructure. Since the KCC previously set the access rates properly changeable to CMT, it makes sense that the KCC may set a KUSF surcharge for CMT to pay, pursuant to 66-2008(b), in order to cover the same cost of supporting the wire line infrastructure, without constituting an exercise of jurisdiction or control over CMT and violating K.S.A. 66-1,143(b). As such, the statutes do not conflict and neither one needs to be struck down.

F. RURAL LECs
Under the Kansas Act, the legislature gave the KCC the authority to require reductions in the access rates which LECs charge to long distance and wireless carriers. K.S.A. 1996 Supp. 66-2005(c). The KCC exercised this authority and mandated a reduction in all access rates on March 1, 1997, as set out in the statute. Under the Kansas Act, the legislature intended for the LECs to recoup a part of their lost revenue, due to reduced access rates, from the KUSF. K.S.A. 1996 Supp. 66-2005(c).
On appeal to the Court of Appeals, several parties challenged the KCC orders and specifically challenged the funding of KUSF, but the parties did not specifically challenge the required access rate reduction. The Court of Appeals set aside the KCC orders relating to the KUSF funding and remanded the matter to the KCC for further proceedings. However, the required access rate reductions were still in effect after the appeal. Thus, the rural LECs may have lost revenue, due to the required access rate reductions, but they were no longer allowed to recoup this lost revenue from a KUSF distribution, since the orders authorizing the KUSF had been set aside by the Court of Appeals. On appeal to this court, some of the rural LECs challenge the Court of Appeals' decision to set aside the KCC orders regarding the KUSF, in light of the required access rate reductions. The rural LECs ask this *395 court to reverse the Court of Appeals and reinstate the KCC orders regarding the KUSF so that they may recoup revenue from the KUSF, which they lost due to the required access rates reductions.
In this opinion, we are reversing the Court of Appeals and reinstating the KCC orders in regard to the KUSF. We cannot tell from the record whether any of the parties actually reduced their access rates and lost revenues while this case was pending in the Court of Appeals and in our court. However, if they did, it is the KCC's responsibility to ensure that all parties are placed in the same financial position that they would have been in had the KCC orders regarding the KUSF never been struck down by the Court of Appeals.

G. UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER TO AN ADMINISTRATIVE AGENCY
CMT argues that 66-2008, which in part authorizes the KCC to require contributions to the KUSF and distribute funds from the KUSF, is an unconstitutional delegation of legislative power to an administrative agency. In making this argument, CMT points out that under the separation of powers doctrine, one of two standards must be satisfied in order to properly delegate power to an administrative agency. First, a delegation of a legislative power is proper if there is constitutional authority for such delegation. State, ex rel., v. Hines, 163 Kan. 300, 303, 182 P.2d 865 (1947). Second, the delegation of administrative power is proper if the delegation contains specific standards and limitations to clearly define how the administrative agency should exercise its delegated power. See State, ex rel., v. State Board of Education, 215 Kan. 551, 556, 527 P.2d 952 (1974). According to CMT, neither of these standards have been met in this case. Hence, CMT asks this court to strike down 66-2008 as an unconstitutional delegation of legislative power to an administrative agency.
Legislative power is the power to make a law, as opposed to the power to enforce a law. A legislature may try to delegate the legislative power to make a law. Such a delegation is improper, unless specific constitutional authority allows the legislature to delegate its legislative power to a different branch of government. If constitutional *396 authority does not authorize a delegation of legislative power, then such delegation is improper and violates the separation of powers doctrine. However, a legislature may also try to delegate an administrative or executive power to a different branch of government. Administrative power is the power to administer or enforce a law, as opposed to the legislative power to make a law. The legislature does not need constitutional authority to delegate administrative power because it is not delegating a power reserved for its branch of government, such as the power to make a law. Thus, the separation of powers doctrine does not prevent a delegation of administrative power, even without constitutional authority for the delegation. However, it is often difficult to determine if the legislature has delegated the legislative power to make a law or the administrative power to enforce a law. The difference between the two types of delegated powers depends upon the amount of specific standards included within the delegation. If the legislature has included specific standards in a delegation, then it has already enacted the law and it is simply delegating the administrative power to enforce the law, based on the standards included in the delegation. On the other hand, if the legislature has not included specific standards within a delegation, then the legislature has delegated the legislative power to make the law and the accompanying standards. Such delegation is improper without constitutional authority. Wesley Medical Center v. McCain, 226 Kan. 263, 270, 597 P.2d 1088 (1979); State, ex rel. v. State Board of Education, 215 Kan. at 554; State, ex rel., v. Fadely, 180 Kan. 652, Syl. ถ 7, 308 P.2d 537 (1957); State, ex rel., v. Hines, 163 Kan. at 303.
K.S.A. 1996 Supp. 66-2008(b) delegates the power to the KCC to access a surcharge on all telecommunications providers in Kansas in order to fund the KUSF. According to CMT, this surcharge constitutes a tax. The power to tax is a legislative power. See Gordon v. Hiett, 214 Kan. 690, 695, 522 P.2d 942 (1974). Thus, CMT argues that K.S.A. 1996 Supp. 66-2008(b) constitutes a delegation to the KCC of the legislative power to tax. CMT then asserts that there is no constitutional authority which authorizes the legislature to delegate its legislative power to tax to the KCC. Thus, CMT claims that 66-2008(b) is an unconstitutional delegation of legislative *397 power to an administrative agency, in violation of the separation of powers doctrine.
SWBT argues that "[n]ot all demands for money made by a governmental body are taxes." The primary purpose of a tax is to raise money, not regulation. Such a demand is only a tax if it is a "`forced contribution to raise revenue for the maintenance of government services offered to the general public.'" Home Builders Ass'n v. City of Overland Park, 22 Kan. App.2d 649, 670, 921 P.2d 234 (1996) (quoting Executive Aircraft Consulting, Inc. v. City of Newton, 252 Kan. 421, 427, 845 P.2d 57 [1993]); see Rural Telephone Coalition v. F.C.C., 838 F.2d 1307, 1314 (D.C. Cir. 1988). According to SWBT, the assessment of a KUSF surcharge is not intended to raise revenue for government services. Instead, such surcharge is intended to assure universally available service at a reasonable rate. Thus, SWBT claims that K.S.A. 1996 Supp. 66-2008(b) is simply a delegation of an administrative power which authorizes the KCC to assess a KUSF surcharge, not a legislative taxing power, and does not need constitutional authorization to be proper.
In support of this position, SWBT cites to Rural Telephone, 838 F.2d 1307. In Rural Telephone, the FCC issued an order relating to the allocation of local exchange costs between interstate and intrastate regulatory jurisdictions. In order to eliminate the disparity between local company "non-traffic sensitive" (NTS) costs and local customer bills, the FCC decided to impose "access charges" to recover NTS costs. The FCC allocated 25% of the NTS costs to interstate jurisdiction, to be phased in over an 8-year period. MCI challenged the 25% allocation as an exercise of the taxing power which Congress could not delegate to FCC without violating the taxing clause under Art. I, ง 8 of the United States Constitution. The Rural Telephone court rejected MCI's argument that the allocation was a tax. In so holding, the court stated:
"[A] regulation is a tax only when its primary purpose judged in legal context is raising revenue. [Brock v. Washington Metropolitan Area Transit Auth., 796 F.2d 481, 488-89, (D.C. Cir. 1986), cert. denied 481 U.S. 1013 (1987)]. There is no reasonable way to construe the NTS cost allocation as having the primary purpose of raising federal revenue. Cf., South Carolina ex rel. Tindal v. Block, 717 F.2d *398 874, 887 (4th Cir. 1983) (it is not an exercise of taxing power, but of the power to regulate commerce, to exact deductions from sales of all commercially marketed milk to offset cost of milk price support program), cert. denied 465 U.S. 1080, 79 L.Ed.2d 764, 104 S. Ct. 1444 (1984)." 838 F.2d at 1314.
Instead of being a tax, SWBT alleges that the KUSF surcharge falls within the range of special regulatory actions consistent with the police power of the state to regulate public utilities. In support of this contention, SWBT quotes from the following cases:
"The act does not delegate to the board ... legislative powers. The legislature, in the exercise of its power to regulate and control public corporations, such as common carriers, may delegate to a board ... certain functions administrative in character which cannot well be performed by the legislature itself." The State v. Railway Co., 76 Kan. 467, Syl. ถ 2, 92 Pac. 606 (1907), aff'd Mo. Pac. Ry. Co. v. Kansas, 216 U.S. 262, 54 L. Ed. 472, 30 S. Ct. 330 (1910) (considering the constitutionality of art. 3, ch. 84 of G.S. 1901 creating the Railroad Commissionโnow the KCC) [see K.S.A. 66-103].
"`While the legislature cannot delegate its constitutional power to make a law (Art. 2, Sec. 1, Kansas Constitution), it can make a law which delegates the power to determine some fact or state of things upon which such law shall become operative.'" Colorado Interstate Gas Co. v. State Corporation Comm., 192 Kan. 29, 37, 386 P.2d 288 (1963), cert. denied 379 U.S. 131 (1964) (quoting Water District No. 1 v. Robb, 182 Kan. 2, Syl. ถ 6, 318 P.2d 387 [1957]).
The Court of Appeals found that the KUSF surcharge, which the KCC has the power to assess under 66-2008(b), is not a tax. In so holding, the Court of Appeals stated:
"CMT argues that the KUSF contribution assessed on its intrastate revenues is a tax and there is no constitutional authorization for the legislature to delegate its taxing authority to the KCC. A `tax' is a forced contribution to raise revenue for the maintenance of governmental services offered to the general public. Executive Aircraft Consulting, Inc. v. City of Newton, 252 Kan. 421, 427, 845 P.2d 57 (1993). The KUSF is not for the benefit of the general public. The monies from the KUSF are to be distributed only to certain qualifying members of the telecommunications industry. K.S.A. 1996 Supp. 66-2008(c). We conclude the KUSF assessment is not a tax." 24 Kan. App.2d at 236.
On appeal to this court, CMT asserts that the Court of Appeals ignored the preamble to the Kansas Act when it found that the KUSF is not a tax because it is not for the benefit of the general public. According to CMT, the preamble of the Kansas Act sets out the purpose of the KUSFโwhich is to secure access to first-class *399 telecommunications for the general public. K.S.A. 1996 Supp. 66-2001. CMT claims that this purpose behind the KUSF indicates that the KUSF, and the surcharge to support it, is for the benefit of the general public. As such, CMT asserts that the KUSF surcharge, under 66-2008(b), is a tax which was improperly delegated to the KCC without constitutional authorization. Thus, CMT concludes that the legislature's delegation of a taxing power (the power to assess a KUSF surcharge) to an administrative agency (KCC) under 66-2008(b), but without constitutional authority, is a violation of the separation of powers doctrine.
We disagree with CMT. The KUSF surcharge authorized in 66-2008(b) is not a tax for two reasons. First, the purpose of the surcharge is not to raise revenue. See Executive Aircraft Consulting, 252 Kan. at 427 (A tax is a forced contribution to raise revenue for the maintenance of government services offered to the general public); Rural Telephone, 838 F.2d at 1314 ("[A] regulation is a tax only when its primary purpose judged in legal pretext is raising revenue"). The KUSF surcharge, authorized in 66-2008(b), does not raise any revenue. Instead, it simply manipulates the manner in which the same money is paid to the same parties in order to make an implicit subsidy explicit.
For instance, before the Kansas Act, LECs charged high access rates to all companies who wished to use their services. These access rates were higher than the cost of providing service. The LECs used the extra money they earned from the high access rates to build and maintain land lines. However, in the Kansas Act, the KCC required LECs to reduce their high access rates. With such reduction, LECs may only charge access rates which approximate the cost of providing service. The LECs are left with no extra money from the high access rates to build and maintain lines. On the other hand, all the companies who purchase access services from the LECs are left with extra money because the high access rates they once paid to the LECs have been reduced due to the Kansas Act. However, instead of allowing these companies to keep this extra money, the KCC imposes a surcharge on these companies under 66-2008(b). This money goes into the KUSF and it is distributed to LECs that use the money to build and maintain land *400 lines. As such, the implicit land line subsidy once found in high access rates is now explicit through the KUSF surcharge and distribution. All the KUSF surcharge does under 60-2008(b) is manipulate the movement of the same money (extra access rate money) to the same parties (from companies purchasing access to the LECs) to be used for the same reasons (to build and maintain land lines). Thus, the purpose of the KUSF surcharge under 66-2008(b) is not to raise revenue. As such, the surcharge is not a tax.
Second, the surcharge in Rural Telephone was not a tax; thus, the surcharge at issue herein is not a tax. CMT's attempt to distinguish Rural Telephone fails. CMT claims that the surcharge in Rural Telephone is distinguishable because its final benefit was not offered to the general public, unlike the surcharge herein. However, the surcharge in Rural Telephone was enacted to fulfill the requirements and purposes of the Federal Act. One of the purposes of the Federal Act is to secure and maintain universal service. Thus, the final purpose of the surcharge in Rural Telephone, among other things, was to secure and maintain universal service. Despite the purpose behind the surcharge, the Rural Telephone court found that the surcharge was not a tax. Thus, following Rural Telephone, just because the purpose and end result of the KUSF surcharge is, among other things, to provide universal service, this does not mean the benefit of the KUSF surcharge is directly offered to the general public. The money collected under the surcharge is offered to the LECs, not the general public. Thus, the surcharge is not a tax. As such, 66-2008(b) does not constitute a delegation to the KCC of the legislative power to tax. Instead, 66-2008(b) is a proper delegation to the KCC of the administrative power to assess a KUSF surcharge, if the legislature included sufficient standards within this delegation of power.
The focus on appeal is: When the legislature delegated the power to administer the KUSF to the KCC in 66-2008, did the legislature include within the Kansas Act sufficient standards to guide the KCC in exercising this power? The answer is clearly yes. One case which is particularly helpful in reaching this answer is Guardian Title Co. v. Bell, 248 Kan. 146, 805 P.2d 33 (1991), which analyzed and upheld the constitutionality of a statute that prohibted *401 unfair methods of competition and deceptive acts or practices in the insurance industry. Guardian Title stated:
"[A] strict application of the separation of powers doctrine is inappropriate today in a complex state government where administrative agencies exercise many types of power and where legislative, executive, and judicial powers are often blended together in the same administrative agency. (Citing In re Sims, 54 Kan. 1, 11, 37 Pac. 135 (1894).
....
"What is required is that a statute express the law in general terms and delegate the power to apply it to an executive agency under standards provided by the legislature. Wesley Medical Center v. McCain, 226 Kan. 263, 270, 597 P.2d 1088 (1979)....
"Where flexibility in fashioning administrative regulations to carry out statutory purpose is desirable in light of complexities in the area sought to be regulated, the legislature may enact statutes in a broad outline and authorize the administrative agency to fill in the details. Nicholas v. Kahn, 62 App. Div.2d 302, 306, 405 N.Y.S.2d 135 (1978), modified 47 N.Y.2d 24, 416 N.Y.S.2d 565, 389 N.E.2d 1086 (1979).
"In testing a statute for adequacy of standards, the character of the administrative agency is important. See Warren v. Marion County, 222 Or. 307, 314-15, 353 P.2d 257 (1960). Here, we are dealing with the insurance commissioner, an expert in regulation of the insurance industry, with a large staff and paid consultants available. The insurance commissioner is charged with regulating a huge, complex industry, and to require explicit, definitive statutes would severely impede, if not make impossible, the regulation of the insurance industry. What is a sufficient standard must necessarily vary somewhat according to the complexity of the area sought to be regulated. See Senior Citizens League v. Department of Social Secur., 38 Wash.2d 142, 161, 228 P.2d 478 (1951); Quesenberry v. Estep, 142 W.Va. 426, 95 S.E.2d 832 (1956).
"Standards may be implied from the statutory purpose. People v. Wright, 30 Cal.3d 705, 713, 180 Cal. Rptr. 196, 639 P.2d 267 (1982). Here, the statutory purpose is set forth in K.S.A. 40-2401, as follows:
`The purpose of this act is to regulate trade practices in the business of insurance ... by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined.'
Here, the legislative purpose for the statute is evident.
"The modern trend, which we ascribe to, is to require less detailed standards and guidance to the administrative agencies in order to facilitate the administration of laws in areas of complex social and economic problems. See Kalbfell v. City of St. Louis, 357 Mo. 986, 993, 211 S.W.2d 911 (1948); Ward v. Scott, 11 *402 N.J. 117, 93 A.2d 385 (1952); City of Utica v. Water Control Bd., 5 N.Y.2d 164, 182 N.Y.S.2d 584, 156 N.E.2d 301 (1959)." 248 Kan. at 153-54.
The Guardian Title case found sufficient standards in the purpose of the statute at issue therein to guide an administrative agency in exercising a delegated power. As in Guardian Title, the Kansas Act provides a declaration of policies and purposes which includes: universal service, improved competition, and protection against fraud. K.S.A. 1996 Supp. 66-2001(a)-(e); see Hines, 163 Kan. at 309. Based on these policies, the legislature created a broad general framework with definite standards. It then delegated to the KCC the power to fill in the details with subordinate rules and regulations, in order to effect the policies which had already been set out. See Hines, 163 Kan. at 314-15.
The standards only have to be sufficiently reasonable and definite. Missouri Pacific Railroad Co. v. McDonald, 207 Kan. 744, 751, 486 P.2d 1347 (1971). The standards set out in the Kansas Act fulfill this requirement. For instance, the standards identify which telecommunications rates should be reduced, when they should be reduced, and over what time period they should be reduced. The standards in the Kansas Act also identify which rates may be increased, how much rates may be increased by (must be just and reasonable under K.S.A. 1996 Supp. 66-1,187), the initial balance of the KUSF, who must pay into the KUSF, how the payments should be made, who qualifies for KUSF distribution, how much distribution an entity should receive, if the KUSF surcharge can be passed along to customers, when and how supplemental funding occurs, and the KUSF administrator's duties.
The standards do leave some discretion to the KCC to determine exactly how a KUSF assessment and payout should occur, but this does not make 66-2008 a delegation of legislative power, as opposed to administrative power. It has long been recognized that public utility regulation, especially regulation of telecommunications, differs in respect to the regulation of other subject matters. The difficulty in understanding the terms, the technology, the funding mechanisms, as well as the importance of the telecommunications field, all require a specialized agency with particular *403 knowledge in the telecommunications field to monitor the industry. See Missouri Pacific, 207 Kan. at 749-50. The KCC is charged with regulating a huge, complex industry. The KCC is an expert in the regulation of the telecommunications industry, with a large staff and paid consultants available. To require more explicit or definite standards than the Kansas Act provides would severely impede, if not make impossible, the regulation of the telecommunications industry. See Guardian Title, 248 Kan. at 153-54.
The Court of Appeals found that when the legislature delegated to the KCC the power to create, fund, and administer the KUSF, the legislature included sufficient guidelines and standards within the Act to direct the KCC in exercising this power. Thus, the court held that the legislature's delegation of the power at issue to the KCC was proper. In so holding, the Court of Appeals stated:
"A statute delegating legislative authority must fix reasonable and definite standards to establish the manner and exercise of the power delegated. The legislature may, however, enact statutes in broad outline and authorize an administrative agency to fill in the details. In testing a statute for adequacy of standards, the character of the administrative agency is important. What is a sufficient standard varies somewhat according to the complexity of the areas sought to be regulated. Standards may also be inferred from the statutory purpose. The trend is to require less detailed standards and guidance to administrative agencies in order to facilitate the administration of laws in areas of complex social and economic problems. Great leeway should be afforded the legislature in setting such standards. See State v. Ponce, 258 Kan. 708, 712-13, 907 P.2d 876 (1995); Guardian Title, 248 Kan. at 154.
"Matters concerning public utilities have been recognized as being highly complex, and the KCC is recognized to have vast expertise and discretion in regulating utilities. Kansas Gas & Electric Co. v. Kansas Corporation Comm'n, 239 Kan. 483, 495, 720 P.2d 1063 (1986).
....
"... It is within the expertise of the KCC to apply those standards in the decision-making process. No unlawful delegation of legislative authority has been shown." 24 Kan. App.2d at 236-37.
We agree with the Court of Appeals. We hold that 66-2008 is a delegation of administrative power, not legislative power. Hence, this delegation is proper and does not violate the separation of powers doctrine. K.S.A. 1996 Supp. 66-2008 is not an unconstitutional *404 delegation of legislative power to an administrative agency. This issue fails.

H(1). INITIAL SIZE OF KUSF
K.S.A. 1996 Supp. 66-2008(a) provides:

"The initial amount of the KUSF shall be comprised of local exchange carrier revenues lost as a result of rate rebalancing pursuant to subsection (c) of K.S.A. 1996 Supp. 66-2005 and subsection (a) of K.S.A. 1996 Supp. 66-2007. Such revenues shall be recovered on a revenue neutral basis. The revenue neutral calculation shall be based on the volumes and revenues for the 12 months prior to September 30, 1996, adjusted for any rate changes." (Emphasis added.)
K.S.A. 1996 Supp. 66-2005(c) provides:
"Subject to the commission's approval, all local exchange carriers shall reduce intrastate access charges to interstate levels as provided herein. Rates for intrastate switched access, and the imputed access portion of toll, shall be reduced over a three-year period with the objective of equalizing interstate and intrastate rates in a revenue neutral, specific and predictable manner. The commission is authorized to rebalance local residential and business service rates to offset the intrastate access and toll charge reductions. Any remaining portion of the reduction in access and toll charges not recovered through local residential and business service rates shall be paid out from the KUSF pursuant to K.S.A. 1996 Supp. 66-2008. Rural telephone companies shall reduce their intrastate switched access rates to interstate levels on March 1, 1997, and every two years thereafter, as long as amounts equal to such reductions are recovered from the KUSF." (Emphasis added.)
K.S.A. 1996 Supp. 66-2007 provides in pertinent part:
"(a) All local exchange carriers and telecommunications carriers providing long distance service in Kansas shall reduce their statewide averaged basic long distance rates to reflect the net reductions in access charges; however, such carriers shall be allowed to increase long distance rates to reflect the KUSF funding requirements set forth in K.S.A. 1996 Supp. 66-2008."
The KCC entered an order attempting to enforce these statutory mandates. The KCC ordered LECs to reduce intrastate access rates to interstate levels over a 3-year period, pursuant to 66-2005(c). The KCC ordered that the LECs be compensated for their lost revenue, due to the required access rate reduction, entirely from the KUSF. Thus, the KCC set the amount of the KUSF at $111.6 millionโthe total amount of revenue estimated to be lost by the LECs due to the access rate reduction. To fund the KUSF *405 with this $111.6 million, the KCC ordered all intrastate telecommunications service providers to pay an assessment into the KUSF in an amount up to 14.1% of their intrastate retail revenues.
Pursuant to 66-2008(b), the KCC authorized all providers who were required to contribute to the KUSF to pass the KUSF assessment on to their customers. The KCC established a method which SWBT, an LEC, must use if it decided to pass the KUSF assessment onto its customers. Under this method, SWBT could recover from each customer, over a 3-year period, a total of $3.21 per monthโ$2 per month the first year; $1 per month the second year; and the rest in the third year. In its Order on Reconsideration, the KCC clarified that the extra $3.21 charge was not a local service rate increase or rate rebalancing. Instead, the extra $3.21 charge per month was simply a method to pass on SWBT's assessment to SWBT's customers. The KCC did not order a local service rate increase or rate rebalancing.
In analyzing the manner in which the KUSF should be funded, the KCC ordered that all of the LECs' lost revenue, due to the access rate reduction, should be recovered from the KUSF. CMT argues that this is contrary to 66-2005(c). According to CMT, the lost revenues, due to the access rate reduction, should first be recovered from an increase in local business and residential service rates or rate rebalancing, so that only the net or "remaining" lost revenue (revenue loss due to access rate reduction minus revenue regained due to increases in local rates) is recovered from the KUSF. In other words, CMT argues that the KCC improperly set the initial size of the KUSF at the same amount as the LECs' lost revenues, due to the access rate reduction, before some of the lost revenues were recovered through rate rebalancing by increasing local business and residential service rates, as required by 66-2005(c). Setting the initial size of KUSF in this way, CMT argues, results in the KUSF being much larger than that contemplated by the statute.
In support of this argument, CMT cites 66-2008(a), which states that "[t]he initial amount of the KUSF shall be comprised of [LECs'] revenues lost as a result of rate rebalancing" pursuant to *406 66-2005(c) and K.S. A. 1996 Supp. 66-2007. (Emphasis added.) K.S.A. 1996 Supp. 66-2005(c) states:
"The commission is authorized to rebalance local residential and business service rates to offset the intrastate access and toll charge reductions. Any remaining portion of the reduction in access and toll charges not recovered through local residential and business service rates shall be paid out from the KUSF pursuant to K.S.A. 1996 Supp. 66-2008."
Based on these statutes, CMT asserts that the Kansas Act intended for the LECs to only look to KUSF for that portion of lost revenues, due to the access rate reduction, which were not recovered from increases in local residential and business service rates or rate rebalancing. Contrary to the KCC's order, CMT argues that all of the LECs' lost revenues, due to the access rate reduction, should not be recovered from the KUSF. Instead, under 66-2008(a), the KUSF should be used to pay off the LECs' remaining or net lost revenues, due to the access rate reduction, after the LECs have recovered some of their lost revenues by increasing local residential and business service rates. Thus, CMT asserts that the Kansas Act dictates the initial size of the KUSF to be the net amount of LECs' revenues lost from the access rate reduction set against the LECs' revenues recovered from increases in local service rates (or the total revenues lost from "rate rebalancing"). According to CMT, the KCC's order which set the initial amount of the KUSF to be the LECs' gross revenues lost from the access rate reduction, without regard to any revenues recovered from local service rate increases, is contrary to the Kansas Act.
In its Order on Reconsideration, the KCC stated that it had not ordered rate rebalancing (increases in local rates), although it was authorized to do so. Further, the KCC found that "66-2008(a) requires the initial KUSF amount to be comprised of revenues lost through access charge and toll reductions." According to CMT, the KCC's order is in error because it does not recognize that 66-2005(c) states that the initial size of the KUSF is to be the amount of revenues lost through access rate and toll reductions remaining after rate rebalancing (which includes increases in local service rates). CMT asserts that the KCC's view of the statute is a clear *407 misreading of the statutory directions provided by the legislature in 66-2005(c).
Because the KCC failed to require rate rebalancing and increase local rates, and because the KCC failed to take into account the recovery, from rate rebalancing, of some of the LECs' lost revenue, due to the access rate reduction, KCFN argues that the KCC set the initial amount of KUSF at an amount which contradicts the language of the Kansas Act and should be reversed. KCFN asks this court to reverse the KCC and instruct the KCC to order increased local rates and recalculate the KUSF initial amount using the proper methodology.
In response, the KCC claims that under the Kansas Act, it had the authority to rebalance the reduction in access rates by increasing local residential and business service rates, but it was not required to do so. According to the KCC, all the Act required it to do was reduce the access rates. The KCC did this, but it decided not to rebalance the access rate reduction by increasing local rates. Instead, the KCC decided to allow the LECs to recover the entire amount of revenues lost, due to the access rate reduction, from the KUSF. In order to fund the KUSF, the KCC assessed all telecommunications providers up to 14.1% of their intrastate revenues. The KCC allows each provider to pass this assessment through to its customers by adding an assessment to each customer's bill. According to the KCC, this passed-through assessment is not a local rate increase.
The KCC contends that it decided not to increase local rates for two reasons. First, residential ratepayers expressed strong opposition to rate increases during public hearings held in August 1996. Second, the KCC wished to retain maximum flexibility so as to reduce the financial impact a reduction in access rates would have on consumers. The KCC knew that if it increased local rates, so that the LECs could recover some of the revenues they lost due to the access rate reduction, then it would be precluded from performing an audit or earnings review with regard to local rates for any LEC electing price cap regulation. To avoid this restriction and retain flexibility to reduce the passed-through assessment (by reducing the LECs' KUSF assessment), the KCC decided to recover *408 the lost revenue, due to the access rate reduction, exclusively through the KUSF. The KCC argues that such a determination was proper because 66-2008 requires the initial amount of the KUSF be comprised of the LECs' revenues lost as a result of the access rate reduction which the KCC did not rebalance or recover by increasing local rates.
The KCC acknowledges that if it had authorized the LECs to increase local service rates, then the initial amount of the KUSF would have been smaller because the LECs' lost revenues, due to the access rate reduction, would have been decreased due to the increased local rates. However, since local rates were not increased, the KCC argues that the entire amount of the LECs' lost revenues, due to the access rate reduction, is appropriately recovered from the KUSF. As such, the KCC asserts that the determination of the initial size of the KUSF at $111.6 million complies with 66-2008.
As the KCC specifically stated in its Order on Reconsideration:
"The Commission recognizes that confusion regarding the KUSF funding methodology exists and wishes to clarify the methodology set out in its Order. All providers of intrastate telecommunications services, including incumbent LECs, will be subject to the same KUSF assessment. K.S.A. 1996 Supp. 66-2008(b) authorizes all contributors to pass through the assessment to their customers. No company is required to pass the assessment through. However, if an LEC decides to pass the assessment through to its customers, the Commission established a method the incumbent LECs must use for doing so. Even if a company passes the assessment through in the form of higher prices for local service, the assessment does not constitute a local service rate increase. It remains a KUSF assessment, which may vary from year to year. Any wholesale discounts from local service prices will be based on the local service price without the KUSF assessment. As stated in the order, the Commission did not order rate rebalancing. Thus, local service rates remain the same as before the assessment, regardless of the manner in which the assessment is passed through."
Since there was no increase in local rates or rate "rebalancing," the entire amount of the LECs' lost revenue, due to the access rate reduction, is reflected in the initial size of the KUSFโ$111.6 million. SWBT asserts that there is no basis to conclude that the KCC's order, setting the initial amount of the KUSF at $111.6 million, is contrary to the Kansas Act.
*409 In rebuttal, CMT claims that $3.21 extra charge to local service customers is actually a local rate increase, as a part of rate rebalancing, and is not a pass-through of SWBT's KUSF assessment. In support of this position, CMT and KCFN cite the language of the KCC order which calls the extra charge a "rate increase." In its December 27, 1996, order, the KCC authorized an estimated "$3.21 per month rate increase for SWBT customers" for the provision of local services. (Emphasis added.) Additionally, the KCC ordered SWBT "to file tariffs reflecting these rates thirty (30) days after receipt of this Order." (Emphasis added.) Finally, CMT points out that the extra charge is a flat, monthly, per line charge and is not tied to a percentage of the customer charges. Hence, CMT and KCFN assert that this extra charge is an increased rate per line and not an assessment of a certain percentage of a customer's charges. Since this extra charge is a local rate increase, CMT and KCFN argue, the rates for local service have been rebalanced by that amount. Thus, CMT and KCFN claim that the revenue generated by this local rate increase should be netted against the revenues lost by the access rate reduction and the initial amount of the KUSF should be reduced accordingly. According to CMT and KCFN, the initial amount of the KUSF, as ordered by the KCC, violates the federal and state prohibitions on implicit subsidies (ง 254); violates state and federal requirements that universal service support be equitable and nondiscriminatory (K.S.A. 1996 Supp. 66-2008[a];ง 254 [f]); and sizes the KUSF in a manner other than that mandated by 66-2005(c) and 66-2008(a). CMT and KCFN ask this court to remand the case to the KCC with orders to redefine the size of the KUSF in accordance with 66-2005 and 66-2008.
The Court of Appeals found that the KCC orders were in error on other grounds. Thus, the Court of Appeals found this issue was moot and did not address it.
In analyzing this issue on appeal, the KCC orders are subject to judicial review pursuant to the Act for Judicial Review and Civil Enforcement of Agency Actions. K.S.A. 77-601 et seq. The reviewing court shall grant relief to petitioners if the agency action, or the action on which the agency action is based, is unconstitutional *410 on its face or as applied. K.S.A. 77-621(c)(1). Similarly, the reviewing court must reject a KCC order if the KCC erroneously interpreted or applied the law. See K.S.A. 77-621(c)(4).
When issues of law are raised by a petition for judicial review, the reviewing court is required to engage in de novo review and may substitute its judgment for that of the KCC. Williams Natural Gas Co. v. Kansas Corporation Comm'n, 22 Kan. App.2d 326, 335, 916 P.2d 52 (1996). The KCC's interpretation of a statute that it is charged to interpret and enforce, using its expertise, is entitled to "great deal of judicial deference" by the courts. City of Wichita v. Public Employees Relations Board, 259 Kan. 628, 631, 913 P.2d 137 (1996). However, the KCC's determination of a question of law is not binding on the reviewing court. Whether the KCC has erroneously interpreted or applied the law in an unconstitutional manner is a question of law over which an appellate court's review is unlimited. See In re Tax Appeal of Scholastic Book Clubs, Inc., 260 Kan. 528, 536, 920 P.2d 947 (1996). If the KCC is mistaken as to a question of law, the reviewing court has an obligation to cure the KCC's action. See National Council on Compensation Ins. v. Todd, 258 Kan. 535, 539, 905 P.2d 114 (1995).
K.S.A. 1996 Supp. 66-2005(c) does not require the KCC to increase local rates after it reduces access rates, or participate in "rate rebalancing." All 66-2005(c) does is require the KCC to reduce access rates. Specifically, 66-2005(c) provides in pertinent part:
"Subject to the commission's approval, all local exchange carriers shall reduce intrastate access charges to interstate levels as provided herein. Rates for intrastate switched access, and the imputed access portion of toll, shall be reduced over a three-year period with the objective of equalizing interstate and intrastate rates in a revenue neutral, specific and predictable manner." (Emphasis added.)
The KCC followed the legislature's directive and did reduce access rates. Also in 66-2005(c), the legislature authorized an increase in local rates to offset the reduction in access rates (or rate rebalancing). As the statute provides in part: "The commission is authorized to rebalance local residential and business service rates to offset the intrastate access and toll charge reductions." (Emphasis added.)
*411 Under any interpretation of 66-2005(c), this language does not require the KCC to increase local service rates; it only authorizes such increases should the KCC choose to recoup lost revenues, due to the access rate reduction, in this manner. The legislature knows the difference between the meaning of the terms "shall" and "authorized," and it used each word within this statute purposefully, to indicate its intent that increases in local rates were not required, only authorized. Then, 66-2005(c) provides that any lost revenues, due to the access rate reduction, which are not recovered through rate rebalancing, shall be paid out of the KUSF. Here, none of the revenues lost, due to the access rate reduction, were recovered from rate rebalancing or increasing the local rates because the KCC chose not to recoup lost revenues in this manner, as it had the discretion to do. Thus, all of the lost revenues, due to access rate reduction, were required to be paid out of the KUSF. These lost revenues amounted to $111.6 million. Thus, the initial balance of the KUSF required to recoup these lost revenues was properly set at $111.6 million.
This conclusion is consistent with 66-2008(a), which provides in part: "The initial amount of the KUSF shall be comprised of local exchange carrier revenues lost as a result of rate rebalancing pursuant to subsection (c) of K.S.A. 1996 Supp. 66-2005...." Here, partial rate rebalancing occurred, as 66-2005(c) required, because access rates were reduced. However, total rate rebalancing did not occur because the KCC did not raise local rates, as it had the discretion not to do under 66-2005(c). Thus, the revenues lost as a result of the partial rate rebalancing which occurred, due to a reduction in access rates, amounts to $111.6 million. As such, the initial amount of the KUSF was properly comprised of the $111.6 million figure.
However, even if 66-2005(c) does not require rate rebalancing or increases in local rates, CMT and KCFN assert that the KCC exercised its discretion and did in fact raise local rates. According to CMT and KCFN, the KCC allowed SWBT to increase its local rates by $3.21 per month over a 3-year period and allowed other LECs to increase their local rates in a similar manner. Thus, CMT and KCFN argue that all of the revenues the LECs lost, due to *412 the access rate reduction, should be set off by these increases in local rates, resulting in an overall smaller amount of lost revenues. As such, CMT and KCFN claim the initial amount of KUSF should be comprised of this overall smaller figure.
The KCC did not authorize any LEC to raise local rates or participate in total rate rebalancing, and no LEC has done so. Admittedly, the KCC uses language in the order which makes it appear that it has raised local rates. However, when looked at carefully, it becomes clear that the KCC is not authorizing an actual increase in local rates. For instance, the KCC order stated: "The estimated $3.21 per month rate increase for SWBT would be allocated as follows...." (Emphasis added.) However, later in the same paragraph, the order states: "United will implement the pass through of its KUSF assessment on a similar per line basis." (Emphasis added.) Further, in its order, the KCC refers to tariffs which must be filed to reflect an "increase in rates." However, this statement refers to an increase in the rates for pay phone directory assistance calls, not an increase in local service rates. Thus, the KCC order does not indicate a local rate increase, as it first appears. Further, in the KCC Order on Reconsideration, it specifically acknowledged its misuse of the term "rate rebalancing" in the order and made it clear that it did not, in fact, raise local rates.
The extra $3.21 charge authorized in the KCC order is not an increase in SWBT's local rates. Instead, the KCC informed SWBT and all other LECs that they could pass on the KUSF assessment to their customers if they so chose. If SWBT chooses to pass on the KUSF assessment to its customers, the KCC set up a method for SWBT to do soโby charging an extra $3.21 per month over a 3-year period. Thus, if SWBT chooses to pass on the KUSF assessment, its customers will have to pay more for local service. However, such an increased payment is not the result of increased local rates, but is the result of the KUSF assessment passed through by SWBT to its customers. In allowing SWBT to pass through the KUSF assessment to its customers, the KCC required SWBT to divide up the passed-through assessment evenly among all its customers. The KCC decided that this pass-through method was a better method than passing a certain percentage of the overall *413 KUSF assessment through to each customer, depending upon the amount of each customer's bill. The KCC chose this pass-through method because it averaged out the passed-through assessment to all customersโplacing a lower percentage of the passed-through assessment on customers with the highest local charge and placing a higher percentage of the passed-through assessment on customers with the lowest local charge.
Using this pass-through method, the charge passed-through to each customer is the same. Thus, it looks like the charge is a local rate increase; in fact, it is simply a pass-through of the KUSF assessment that SWBT and other LECs are required to pay. As such, the LECs did not receive any extra revenue from this nonexistent local rate increase. Hence, this nonexistent extra revenue cannot be used to set off the LECs' actual lost revenue, due to the access rate reduction. Under 66-2008(a), the initial balance of the KUSF is required to comprise an amount equal to the LECs' lost revenue after rate rebalancing. The KCC did not order rate rebalancing, as it had the discretion to do. Thus, after nonexistent rate rebalancing, the LECs' lost revenue, due to the access rate reduction, equaled $111.6 million. As such, the KCC properly set the initial balance of the KUSF of $111.6 million. The KCC's orders, setting the initial size of the KUSF, complies with K.S.A. 1996 Supp. 66-2008 and is in conformity with the Kansas Act. This issue fails.

H(2). LOCAL EXCHANGE CARRIERS' CONTRIBUTIONS
K.S.A. 1996 Supp. 66-2008(b) requires that the KUSF be funded from contributions by all intrastate telecommunications carriers on an "equitable and nondiscriminatory" basis. Pursuant to this statute, the KCC required all carriers to contribute 14.1% of their intrastate revenues to KUSF. However, the KCC recognized that a certain set of these contributors, based on certain eligibility criteria, would also be entitled to payouts or distributions from the KUSFโto recompensate the contributors for the revenue they lost due to the required access rate reduction. Under the eligibility criteria, the contributors who are also entitled to KUSF distributions are LECs. Thus, instead of requiring these contributors (LECs) to pay into the KUSF 14.1% of their intrastate revenues *414 and then turn around and receive a payment from KUSF for their lost revenues, due to the access rate reduction, the KCC allowed the LECs to set off these amounts. With this setoff, the KCC did not order all LECs to pay a full 14.1% of their intrastate revenues into the KUSF as the other carriers were required to do. Instead, the KCC allowed an LEC to calculate 14.1% of its revenue and then subtract from this figure the amount that the LEC expects to receive from the KUSF as a distribution, to compensate the LEC for revenue it lost due to the access rate reduction. The KCC only requires that the LEC is to pay the result of this equation into the KUSF; the LEC does not have to pay a full 14.1% of its intrastate revenue. Of course, by using such a setoff procedure, the LEC does not actually receive a distribution from the KUSF. The LEC simply keeps the amount of money the KUSF would have distributed to it. According to the KCC, it adopted this setoff procedure to lessen the administration burden placed on the KUSF "so as to avoid unnecessary fund transfers."
According to KCFN and CMT, the KCC orders violate 66-2008(b), the mandate which requires that the KUSF contributions be "equitable and nondiscriminatory." KCFN and CMT assert that the required KUSF contributions are not equitable and nondiscriminatory because the LECs are exempted, under the KCC orders, from contributing to the KUSF in the same manner as all other carriers. As KCFN and CMT point out, all carriers, except for the LECs, must contribute 14.1% of their intrastate retail revenues to the KUSF. On the other hand, KCFN and CMT contend that the LECs do not have to contribute 14.1% of their revenues to KUSF, due to the KCC's setoff procedures. Thus, KCFN and CMT assert that the KCC orders, allowing a setoff procedure, create an inequitable and discriminatory methodology for KUSF contributions which violates 66-2008(b). KCFN and CMT ask this court to strike down the KCC orders regarding KUSF contributions, including the setoff procedure, as a violation of Kansas law.
Currently, LECs are the only providers eligible to utilize the setoff procedure. This is because the LECs are the only providers that are initially eligible for KUSF distributions, which may be used to set off the required KUSF contributions. As SWBT points out, *415 there can be no setoff for CMT or KCFN because these providers are not eligible recipients of KUSF funds and will not obtain any distributions from KUSF to offset their required contributions. K.S.A. 1996 Supp. 66-2008(c). SWBT contends that the setoff procedure is nothing more than a "net" billing process. According to SWBT, the KCC orders regarding the KUSF contribution methodology, including the setoff procedure, is equitable and nondiscriminatory and does not violate 66-2008(a). SIA follows this analysis.
The KCC orders relating to the setoff procedures do not improperly exempt LECs from contributing to the KUSF in violation of 66-2008(b), which requires contributions to the KUSF be made on equitable and nondiscriminatory basis. All carriers, including the LECs, are required to contribute 14.1% of their intrastate revenues to the KUSF. Thus, this contribution requirement is set up on an equitable and nondiscriminatory basis. LECs are allowed to setoff their KUSF contributions with a KUSF distribution, to which they are entitled. However, the setoff determination starts out with the calculation that LECs must contribute 14.1% of their intrastate revenues to the KUSF. If a LECs KUSF distribution exceeds this amount, then the LEC is not required to make a contribution to the KUSF. This does not constitute a KUSF exemption for the LEC. Rather, this is simply an accounting mechanism, to prevent the LEC from paying its contribution to the KUSF and the KUSF then paying the money right back to the LEC as a KUSF distribution. The setoff procedure was simply ordered by the KCC to "avoid unnecessary fund transfers"; it does not exempt the LECs from their required KUSF contributions.
All providers are allowed to use the setoff procedure if they receive a KUSF distribution and are required to contribute to the KUSF. A provider may receive a distribution from the KUSF if it meets the eligibility requirements set out in 66-2008(c) and ง 214(e)(1). As 66-2008(c) provides: "Pursuant to the federal act, distributions from the KUSF shall be made in a competitively neutral manner to qualified telecommunications public utilities, telecommunications carriers and wireless telecommunications providers, that are deemed eligible." Thus, CMT and KCFN may become *416 eligible for KUSF distributions. At that time, they can utilize the setoff procedures. Nonetheless, they will still be subject to an overall contribution to the KUSF in the amount of 14.1% of their intrastate revenues. This contribution can be paid directly to the KUSF or it can be set off of their KUSF distribution, just as any LEC may do. The right to use the setoff procedure does not make an LEC exempt from its KUSF contribution requirement and will not make CMT and KCFN exempt from such requirement if they become entitled to a KUSF distribution and the right to use the setoff procedure. All providers must contribute 14.1% of their intrastate revenues to the KUSFโwhether as a direct payment or as a setoff. Thus, all providers are required to contribute to the KUSF on an equitable and nondiscriminatory manner as required by 66-2008(b). The KCC's orders relating to the setoff procedures do not exempt LECs from contributing to the KUSF and do not violate 66-2008(b). This issue fails.
The Court of Appeals is affirmed in part and reversed in part; the KCC is affirmed. The order of this court entered on January 29, 1998, to stay the KCC's implementation of changes in the access charges of SWBT and Sprint, along with corresponding changes to the KUSF, is hereby dissolved.